IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:14-cv-668

CAROLINA RESTAURANT GROUP, INC.,

    Plaintiff,

vs.

PEPSICO SALES, INC.,

    Defendants.

**ORDER**

**THIS MATTER** comes before the Court upon Defendant's Motion to Dismiss (Doc. No. 23), Defendant's Memorandum in Support (Doc. No. 24), Plaintiff's Response in Opposition (Doc. No. 25), and Defendant's Reply Memorandum in Further Support of Defendant's Motion to Dismiss (Doc. No. 26.) Defendant asks this Court to dismiss each of Plaintiff's claims pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief may be granted.

## I. FACTUAL BACKGROUND

On November 4, 2014, Plaintiff Carolina Restaurant Group, Inc. ("CRG"), filed this action against Pepsico Sales, Inc. ("Pepsi") in Mecklenburg County Superior Court. Pepsi timely removed this action to this Court. Plaintiff thereafter filed its Amended Complaint alleging (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) declaratory judgment; (4) unfair and deceptive trade practices; and (5) unlawful restraint on trade.

1

CRG operates Wendy's fast food restaurants in North and South Carolina. On August 1, 1998, CRG entered into a contract with Defendant Pepsi that contained an exclusive dealings provision requiring CRG to serve only Pepsi postmix fountain beverage products at its Wendy's franchise restaurants. (Doc. No. 21 ¶ 7-11; *see generally* Doc. No. 7-1, "The Agreement".) Furthermore, the contract required CRG to sell Pepsi products in accordance with the conditions set forth in the contract, including the manner in which each party would receive payment. (Doc. No. 21 ¶ 12-13.) The contract provided that Pepsi would advance marketing funds to CRG to help grow the sales of Pepsi fountain beverage products. CRG would "earn" the marketing funds over time through the purchase of specified gallons of Pepsi product.

The contract was set to last until "the later of (i) July 31, 2008 and (ii) the date on which CRG has purchased 10,000,000 Gallons." (Doc. No. 7-1 at 2; Doc. No. 21 ¶ 14.) However, CRG was permitted to terminate its relationship with Pepsi early with minimal penalty through application of the Permitted Termination clause which stated: "CRG shall have the right to terminate this Agreement ('a Permitted Termination') shall not be a Default [sic], upon 90 days' prior notice to [Pepsi] in the event that CRG has made the reasonable, good faith determination that the continuation of this Agreement will materially and adversely affect the ability of CRG to achieve the Outlet Growth Targets." (Doc. No. 7-1 at 7; Doc. No. 21 ¶ 15.) These "Outlet Growth Targets" were defined by the contract as "the operation by CRG of at least the following numbers of Outlets as of the end of the following respective years: third year – 200; fourth year – 250; fifth year – 400." (Doc. No. 7-1 at 2.) The contract defined "Outlets" as "all present and future Wendy's concept food service outlets operated by CRG and located" in the United States. (Doc. No. 7-1 at 2.)

In the event of an early termination, the type of termination undertaken by the parties would affect the monetary compensation owed by the terminating party. (Doc. No. 21 ¶ 19.) If CRG engaged in a Permitted Termination, CRG would repay Pepsi all of the advanced but unearned funding it had received from Pepsi. (Doc. No. 7-1 at 8.) However, if the termination was not a Permitted Termination,

> [t]hen, in addition to any other remedies to which Pepsi-Cola may be entitled (including without limitation the payment to Pepsi-Cola for any amount by which the Equipment and/or Service Amounts exceed the amount of Marketing Funds withheld respect thereto), CRG shall immediately pay to Pepsi-Cola an amount, as liquidated damages and not as a penalty, for lost profits and/or expenses suffered or incurred by Pepsi-Cola as a result of such breach, which amounts would be difficult or impossible of determination, equal to the product of (i) $0.75 multiplied by (ii) the amount by which 10,000,000 exceeds the number of gallons as of the date of termination.

(Doc. No. 7-1 at 8.) Essentially, Pepsi would be awarded both the payment of funds advanced to CRG as well as substantial funds in the form of liquidated damages. (Doc. No. 21 ¶ 20.)

The parties subsequently amended the Agreement on January 13, 2012, changing some funding provisions, but leaving intact the provisions on Default, CRG's Outlet Growth Targets, and CRG's Permitted Termination rights. (Doc. No. 21 ¶ 21-22; *see* Doc. No. 7-2, Amendment of Agreement.)

After the parties entered into the Agreement, CRG's national franchisor, Wendy's, signed national contracts with Coca-Cola, obligating franchisees to offer Coca-Cola fountain products at their restaurants. (Doc. No. 21 ¶ 24.) CRG asserts that this move has reduced CRG's marketing rebates, slowed CRG's expansion to much less than previously anticipated, hindered CRG's relationship with Wendy's national advertising committee and fellow franchisees, hurt sales, and

left CRG's Wendy's outlets out of alignment with Wendy's national promotional and advertising efforts. (Doc. No. 21 ¶ 25-6.)

In light of the slowed growth, CRG has missed all Outlet Growth Targets set out in the Agreement. (Doc. No. 21 ¶ 28.) Despite this fact, CRG did not attempt to claim a Permitted Termination during the period from 1998 – 2003; rather, CRG sent its first letter to Pepsi on April 3, 2013, expressing interest in terminating the relationship. (Doc. No. 21 ¶ 23-24.) CRG alleges that it subsequently contacted Pepsi on numerous occasions to discuss a mutual termination of their contract and Pepsi intentionally delayed these deliberations. (Doc. No. 21 ¶ 38-41.)

On June 24, 2013, Pepsi responded and requested the amount of $2,637,000 as a termination payment. (Doc. No. 21 ¶ 37.) On May 27, 2014, Pepsi sent a letter to CRG asking for $3,360,000 as a termination payment and $5,500,000 in liquidated damages. (Doc. No. 21 ¶ 42-43.) After more letters were exchanged, CRG unilaterally terminated the Agreement on February 2, 2015 asserting that it had done so as a Permitted Termination. (Doc. No. 21 ¶ 48.)

CRG then filed this lawsuit in November of 2014, alleging that Pepsi's refusal to accept a Permitted Termination has harmed CRG's business, that Pepsi's demand for liquidated damages and advanced revenues and funds lacks any foundation under the Agreement, and that Pepsi's increased demands were made to intimidate CRG and coerce them into paying more money. (Doc. No. 21 ¶ 50.) CRG asserts claims of breach of contract, breach of implied covenant of good faith and fair dealing, declaratory judgment, unfair and deceptive trade practices, and unlawful restraint on trade.

The Defendant filed a Motion to Dismiss contending that each of these claims fails and should be dismissed with prejudice. Having had the opportunity to consider the parties'

respective filings on this issue, the Court will now rule on this matter. For the reasons set forth below, the Motion is **GRANTED IN PART AND DENIED IN PART**.

## II. LEGAL STANDARD

When faced with a Rule 12(b)(6) motion to dismiss, courts are instructed to "accept as true all well-pleaded allegations and . . . view the complaint in a light most favorable to the plaintiff." *Mylan Labs, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). After "assum[ing] the veracity" of a plaintiff's factual allegations, the court is to "determine whether they plausibly give rise to an entitlement to relief," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and if they "raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Thus, a "complaint may proceed even if it strikes a savvy judge that actual proof of [the facts alleged] is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* at 556, quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). However, the court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Mkts., Inc. v. J.D. Assocs. LLP*, 213 F.3d 175, 180 (4th Cir. 2000). Moreover, the court need not accept allegations that "contradict matters properly subject to judicial notice or by exhibit." *Blankenship v. Manchin*, 471 F.3d 523, 529 (4th Cir. 2006). Additionally, "in considering a motion to dismiss, the Court may consider the Complaint, [and] documents incorporated or referenced in the Complaint." *See In re Wachovia Erisa Litig.*, 2010 WL 3081359, at *2 (W.D.N.C. Aug. 6, 2010).

## III. DISCUSSION

Pepsi argues that none of the five counts in CRG's Amended Complaint state a claim on which relief can be granted and seeks dismissal with prejudice. Pepsi asserts that this lawsuit is

5

the result of CRG's displeasure with Pepsi's unwillingness to waive the contractual remedies to which Pepsi believes it is entitled. The Court will address each claim below.

### A. Breach of Contract

CRG alleges that "Pepsi's unsubstantiated refusal to recognize and failure to accept CRG's February 2, 2015 termination as a Permitted Termination [*inter alia*] is a material and aggravated breach of Pepsi's duties under the Agreement." (Doc. No. 21 ¶ 57.) CRG also cites Pepsi's demand for liquidated damages and refusal to discount the advanced funds as breaches of contract. (*Id*. at ¶ 58-59.) Pepsi contends that this claim fails under New York law[1] and none of these allegations give rise to an actionable claim because CRG has failed to identify any conduct by Pepsi that can be considered a breach of its contractual duties.

Under New York law, a breach of contract claim requires proof of (1) an agreement; (2) adequate performance by the plaintiff; (3) breach by the defendant; and (4) damages. *Fischer & Mandell, LLP v. Citibank, N.A.,* 632 F.3d 793, 799 (2d Cir. 2011). Breach is defined as "nonperformance" of a duty under a contract, and "can only occur when one is under an obligation to perform in the first instance." *Stratton Group, Ltd. v. Sprayregen*, 458 F. Supp. 1216, 1218 (S.D.N.Y. 1978); *see also Commerce Funding Corp. v. Comprehensive Habilitation Servs., Inc.*, 2005 WL 447377, at *8 (S.D.N.Y. Feb. 24, 2005).

In the present case, a valid contract exists and this Court will accept as true Plaintiff's assertions of its own compliance stated in its Complaint. (Doc. No. 21 ¶ 56.) However, Plaintiff's Amended Complaint lacks any allegation that Pepsi has not performed any of its contractual duties under the Agreement. What CRG identifies as a "breach," Pepsi's refusal to

---

[1] The "Governing Law" provision of the Agreement states that "[it] shall in all respects be construed in accordance with and governed by the substantive laws of the state of New York without giving effect to the conflict of law provision thereof."

6

recognize CRG's supposed Permitted Termination, is merely a dispute regarding the interpretation of the contract, not the failure of Pepsi to perform its duties. Therefore, because CRG has not identified a nonperformance by Pepsi of a duty owed under the contract, this claim fails and is dismissed for failure to state a claim.

### B. Breach of the Implied Covenant of Good Faith and Fair Dealing

CRG's second claim asserts that Pepsi breached the Implied Covenant of Good Faith and Fair Dealing, by "(i) refusing to recognize and accept CRG's Permitted Termination; (ii) demanding unlawful payments from CRG; and (iii) refusing to recognize and accept CRG's right to a discount to net present value on the advanced revenues and funds as provided for in the Agreement." (Doc. No. 21 ¶ 63.)  Pepsi argues that this claim fails because it simply duplicates the allegations of the first claim and asserts that these allegations also give rise to a breach of an implied covenant of good faith and fair dealing, which fails to state a unique claim.

Under New York law, in order to survive a motion to dismiss a claim for breach of the implied covenant of good faith and fair dealing, "the plaintiff must allege facts that tend to show that the defendant sought to prevent performance of the agreement or to withhold its benefits from the plaintiff." *Held v. Macy's, Inc.*, 2009 WL 3465945, at *14 (N.Y. Sup. Ct. Oct. 19, 2009). Furthermore, "[a] breach of the implied covenant of good faith claim can survive a motion to dismiss 'only if it is based on allegations different from those underlying the accompanying breach of contract claim.'" *Id.* (internal citations omitted). Additionally, New York courts consistently dismiss claims for breach of the implied covenant of good faith and fair dealing as duplicative when the claim is based upon the same factual allegations as plaintiff's breach of contract claim and seeks damages for the same alleged injury. *See Cary Oil Co., Inc. v. MG Refining and Marketing Inc.,* 90 F. Supp. 2d 401, 419 (S.D.N.Y. 2000) ("[U]nder New York

law, a claim for breach of the implied covenant will be dismissed if the conduct allegedly violating the implied covenant is also the predicate for breach of the underlying contract.").

In the present case, Plaintiff's first claim asserts that Pepsi breached the contract when it (1) failed to accept CRG's permitted Termination; (2) demanded liquidated damages CRG considers unlawful; and (3) refused to discount the advanced revenues and funds, (Doc. No. 21 ¶ 56-59). This breach of contract claim is identical to Plaintiff's second claim asserting Pepsi breached the implied covenant of good faith and fair dealing by "(i) refusing to recognize and accept CRG's Permitted Termination; (ii) demanding unlawful payments from CRG; and (iii) refusing to recognize and accept CRG's right to a discount to net present value on the advanced revenues and funds as provided for in the Agreement." (Doc. No. 21 ¶ 63.) Due to the identical nature of the first and second claims in Plaintiff's Amended Complaint, Plaintiff's claim of breach of the implied covenant of good faith and fair dealing also fails to state a claim.

### C. Declaratory Judgment

CRG's third claim seeks a declaratory judgment from the Court establishing that CRG is "entitled to a Permitted Termination under the Agreement," and, in connection with such a Permitted Termination, that "CRG is entitled to a net present value discount on the advanced revenues and funds." (Doc. No. 21 ¶ 70-71.) Pepsi contends that CRG "has no right to either form of relief because (i) CRG's opportunity to claim a Permitted Termination expired more than 11 years ago, and (ii) CRG is not entitled to any discount on its repayment of advanced but unearned funding." (Doc. No. 24 at 17.)

Under New York law, "[i]n construing a contract [courts] look to its language, for 'a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.'" *Quadrant Structured Products Co. v. Vertin*, 23

N.Y.3d 549, 559-60 (2014) (quoting *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002)). Furthermore, "[w]hether an agreement is ambiguous is a question of law for the courts." *Kass v. Kass*, 91 N.Y. 2d 554, 566 (1998). A contract "is unambiguous 'if the language it uses has a definite and precise meaning, unattended by danger of misconception in the purport of the [agreement] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Ellington v. EMI Music, Inc.*, 24 N.Y.3d 239, 244 (2014) (quoting *Greenfield,* 98 N.Y.2d at 569) (internal quotations omitted). Alternatively, a contract is ambiguous if "on its face, [it] is reasonably susceptible of more than one interpretation.'" *Salinger v. Salinger*, 125 A.D.3d 747, 749 (N.Y. App. Div. 2015) (quoting *Clark v. Clark*, 33 A.D.3d 836, 837 (2006)).

The Court finds that the Agreement at issue herein is reasonably susceptible of more than one interpretation. The provision defining Outlet Growth Targets does state targets for the first five years after the commencement of the contract, but does not expressly provide that this option expires on the fifth year. (Doc. No. 7-1 at 2.) Moreover, the section regarding execution of the Permitted Termination likewise does not state that this option expires after five years. (Doc. No. 7-1 at 7.) The presence of ambiguity regarding the duration of the Permitted Termination Option renders Plaintiff's declaratory judgment claim plausible.

CRG's second request, a declaratory judgment stating that "CRG is entitled to a net present value discount on the advanced revenues and funds," relates to its first request regarding the Permitted Termination clause. Due to the contractual ambiguity, the second declaratory judgment request plausibly gives rise to an entitlement to relief. Therefore, Pepsi's Motion to Dismiss as to this claim is denied.

9

### D. Unfair and Deceptive Trade Practices

CRG claims that Pepsi violated North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA") prohibiting unfair and deceptive trade practices when it refused "to accept CRG's right to: (i) a Permitted Termination; and (ii) a net present value discount on the advanced revenues and funds constitut[ing] an inequitable assertion of power over CRG." (Doc. No. 21 ¶ 75.) Furthermore, CRG alleges that Pepsi deliberately delayed finding a mutually beneficial termination of the contract and "substantially and continually increased its payment demands as negotiations continued" in order to intimidate CRG. (Doc. No. 21 ¶ 76.) Pepsi contends that it was simply asserting its rights under the agreement, which is not a breach of contract nor an unfair or deceptive trade practice.

In order to bring a claim under the UDTPA, a plaintiff must allege that (1) the defendant committed an unfair or deceptive act or practice; (2) in or affecting commerce; and (3) plaintiff was injured as a result. *Phelps- Dickson Builders, L.L.C. v. Amerimann Partners*, 172 N.C. App. 427, 439 (2005). A practice is unfair and deceptive "when it offends established public policy as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers." *Eastover Ridge, LLC v. Metric Constructors, Inc*., 139 N.C. App. 360, 367 (2000). Moreover, "the 'relevant gauge' of an act's unfairness or deception is '[t]he effect of the actor's conduct on the marketplace.'" *Carcano v. JBSS, LLC*, 200 N.C. App. 162, 172 (2009) (quoting *Ken-Mar Finance v. Harvey*, 90 N.C. App. 362, 365 (1988)).

In North Carolina, "a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to sustain an action under N.C.G.S. 75-1.1." *Branch Banking and Trust Co. v. Thompson*, 107 N.C. App. 53, 62 (1992); *see also Dolan v. Dickson Properties, Inc.,* 735 S.E.2d 632 (Table) (N.C. App. 2012) (affirming dismissal of plaintiff's claim under N.C. Gen. Stat. §

75-1.1). In order to seek liability in the context of a breach of contract action, the plaintiff must establish "substantial aggravating circumstances attendant to the breach of contract." *Gray v. N.C. Ins. Underwriting Assocs.*, 352 N.C. 61, 68 (2000). These allegations must be "'distinct' from the allegations regarding a breach of contract, and not based on the 'existence of an agreement, the terms contained in the agreement, and the interpretation of the agreement.'" *Dew Elec., Inc. v. Mass. Elec. Const. Co.*, 2010 WL 2131899, at *4 (W.D.N.C. May 25, 2010).

Here, because CRG has failed to establish that Pepsi breached the Agreement, much less conducted an "aggravated" breach, this claim must fail for this reason alone. Additionally, CRG's conclusory allegation that Pepsi's conduct during the parties' negotiations was "an inequitable assertion of power" adds nothing to this claim. (Doc. No. 21 ¶ 76.) Pepsi's refusal to grant a Permitted Termination is not unfair or deceptive, does not offend public policy, and is not immoral, unethical, oppressive, or unscrupulous because CRG was permitted to terminate the contract at any time. CRG's displeasure with Pepsi's unwillingness to modify the agreement for CRG's benefit is not sufficient to establish a claim for unfair and deceptive trade practices.

### E.  Unlawful Restraint on Trade

Finally, CRG asserts that the Agreement with Pepsi "constitutes an unreasonable restraint on trade in violation of North Carolina General Statute § 75-1" due to the duration of the agreement and exclusive dealing provision, along with Pepsi's unwillingness to agree to a Permitted Termination or a discount on CRG's repayment of the marketing funds. (Doc. No. 21 ¶ 82-87.) CRG argues that Pepsi's actions harm the "competitive process by suppressing and substantially lessening" competition and harm "the public as a whole because they limit consumer choice." (Doc. No. 21 ¶ 83-84.) Pepsi argues that CRG's allegations fall far short of

the requirements for properly pleading an antitrust violation under Section 75-1 and should be dismissed.

To maintain a claim under either Section 75-1 or Section 1 of the Sherman Act, upon which North Carolina's law is modeled, a plaintiff must plead facts sufficient to establish the existence of an agreement "that imposes an unreasonable restraint on trade." *Oksanen v. Page Memorial Hospital*, 945 F.2d 696, 702 (4th Cir. 1991). In order to determine whether a restraint is unreasonable, courts employ one of two analytical frameworks: (1) the *per se* rule, which applies to plainly anticompetitive conduct such as price fixing and group boycotts; or (2) the more lenient "rule of reason." *Id.* at 708. CRG has not alleged that Pepsi's conduct constitutes a *per se* violation of the antitrust laws so the rule of reason becomes the appropriate analysis.

Under the rule of reason analysis, the plaintiff must clearly define the relevant market that is affected by the conduct. *Id.* at 709. A relevant market has both a product and a geographic dimension. *See Apani Southwest, Inc. v. Coca-Cola Enters., Inc*., 300 F.3d 620, 627 (5th Cir. 2002) "'[T]he reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it' determine '[t]he outer boundaries of a product market.'" *Chapman v. New York State Division for Youth*, 546 F.3d 230, 237-38 (2d Cir. 2008), citing *Brown Show Co. v. United States*, 370 U.S. 294, 325 (1962). The relevant geographic market is "the area of effective competition…in which the seller operates, and to which the purchaser can practicably turn for supplies." *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 359 (1963).

In addition to properly defining a relevant market, a plaintiff must allege facts sufficient to show that the defendant has market power. *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus.*, 889 F.2d 524, 528 n.8 (4th Cir. 1989). Market power is "the ability to raise

12

prices above those that would be charged in a competitive market." *Id.* Market power is usually demonstrated by a defendant's "dominant market share in a well-defined relevant market." *See Flegel v. Christian Hosp.*, 4 F.3d 682, 688-89 (8th Cir. 1993).

Here, CRG offers the bare allegation that the product market is the postmix fountain beverage market. CRG fails to define a product market "with reference to the rule of reasonable interchangeability and cross-elasticity of demand." *See Apani*, 300 F.3d at 628 (affirming dismissal of plaintiff's antitrust claims under the Sherman Act). There are no allegations identifying the types of products included in this market, other participants in this market, or alleging why there are not reasonable substitutes for postmix fountain beverage products. The Court finds CRG's product market allegations vague and lacking the details necessary to meet the standards required under the statute.

CRG's relevant geographic market allegations are likewise inadequate. CRG merely asserts that "North and South Carolina" is the relevant geographic market, but fails to explain the competitive or economic significance of this broad region. Plaintiff's conclusory allegations are insufficient to state a claim.

In addition to its failure to properly allege a relevant product and geographic market, CRG fails to allege facts sufficient to show that Pepsi has market power. CRG merely asserts that Pepsi has "market power" because "the failure to accept a Permitted Termination and use of an unreasonable exclusivity provision harms the public as a whole because they limit consumer choice and increase prices in the market for postmix fountain beverage products." (Doc. No. 21 ¶ 84.) These conclusory allegations fall far short of demonstrating that Pepsi has "the ability to raise prices above those that would be charged in a competitive market." *See Murrow Furniture Galleries, Inc*., 889 F.2d at 528 n.8.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss (Doc. No. 23) is hereby **GRANTED IN PART AND DENIED IN PART**. Plaintiff's claims are dismissed except for its claim for declaratory judgment.

Signed: July 13, 2015

Graham C. Mullen
United States District Judge